**UNITED MINE WORKERS OF AMERICA DISTRICT 28 and Local Union No. 2232, Plaintiffs,**

v.

**VP–5 MINING COMPANY and Island Creek Coal Company, Defendants.**

**Civ. A. No. 85–0308–A.**

United States District Court, W.D. Virginia, Abingdon Division.

March 25, 1986.

Thad Harris, Castlewood, Va., for plaintiffs.

Larry W. Blalock, Charleston, W.Va., Stephen M. Hodges, Abingdon, Va., for defendants.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiffs, District 28 and Local Union No. 2232 of the United Mine Workers of America (the Union), brought this action under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to obtain in certain grievances, which were then awaiting arbitral hearings, enforcement of the terms of a settlement previously negotiated between the Union and one of the defendant companies, VP–5 Mining (the Company).[1] The action is now before the court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56.

### I.

The following facts are not in dispute. At all times relevant to this action, both the Union and the Company were bound by the terms of the successive wage agreements entitled "The National Bituminous Coal Wage Agreement of 1978, 1981 and 1984" (the Wage Agreement). A four-step grievance and arbitration procedure for the settlement of disputes between union member employees and management is set forth in the Wage Agreement in Article XXIII. Section (c)(1) of Article XXIII provides that first step settlements "shall not constitute a precedent in the handling of other grievances." Article XIII, § (h) goes on to provide:

> Settlement reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement. Settlements reached at Steps 2 and 3 shall be in writing and signed by appropriate representatives of the Union and the Employer.

1. Although the Union alleges in the complaint that defendant Island Creek Coal Company is an employer of members of Local Union No. 2232, which Island Creek denies, the Union does not set forth facts that would indicate that Island Creek was a party to the settlement agreement at issue. The discussion herein, therefore, will only be in reference to the Union and defendant VP–5 Mining. Furthermore, the issue of Island Creek's alleged liability will not be a subject open for an amended complaint, given the court's position on the motion for summary judgment as to VP–5 Mining.

On or about September 11, 1984 employees Kenneth Hess and Christopher Lester filed contractual grievances on behalf of certain union member employees of Local Union 2232 against the Company. The grievances arose over work that had been performed by an outside contractor for the Company. The grievances were settled at the second step of the grievance process whereby the Company agreed to pay various employees a pro-rata share of the cumulative time worked by the outside contractor in excess of 7¼ hours per day. In each of the two grievance forms, the grievant signed his name to a request that management comply with past 1st step settlements regarding [the issue of the outside contractor's work on the dates cited]. The Company's Mine Superintendent, Harold Hamilton, responded respectively: "Management agrees to abide by 1st step settlement regarding this issue;" and "Management agrees to settle this grievance by complying with the 1st step settlement on this issue."

The disputed issue in the case at bar is over the intended effect of the settlement of the Hess and Lester grievances beyond that described above. The Union seeks to have the settlement enforced prospectively in grievances pending for arbitration. In arguing that the settlement should be so enforced, the Union relies heavily upon the affidavit statements of Terry Puckett, who, as President and Mine Committeeman of Local Union 2232, negotiated the settlement with Mine Superintendent Hamilton. According to Puckett, under the terms of the settlement the Company agreed to a "policy of equalized time" between employee members of Local 2232 and independent contractors, who occasionally perform non-bargaining unit work for the Company. More specifically, Puckett contends that the Company agreed to work its union member employees an equal number of hours as any independent contractor, including overtime; and that the agreement applies to all days worked regardless of whether they occur during the regular work week or on weekends, holidays, idle days or during vacation period. It is also Puckett's contention that the equalized time policy has been in effect since the Spring of 1979 and has been the basis of numerous first step grievance settlements between the Company and union member employees. The Union argues that such is evidenced by the Company's use of language—to abide by the 1st step settlement—in the settlement of the Hess and Lester grievances. Having thus provided support for the particularization of both the origin and substance of the settlement at issue, the Union characterizes its action as merely an attempt to enforce the finality provision of Article XXIII, section (h) of the Wage Agreement in subsequent grievances requesting time equalization, and not an attempt to preempt the dispute resolution mechanism of that agreement.

The Company, on the other hand, generally denies that it agreed to "equalize" time as described by Puckett, and offers Mine Superintendent Hamilton's affidavit in support of its version of the facts surrounding, and the substance of, the settlement at issue. Hamilton's contentions are as follows: He denied the Hess and Lester grievances at the first step of the grievance process, but decided that since he was new in the position of mine superintendent he would investigate the grievants' claims that the Company had previously equalized time in the manner described in the grievances. Prior to the second step meeting on the grievances, he concluded that the Company had equalized time between collective bargaining unit employees and independent contractors by agreement reached at the first step of the grievance procedure; however, such had not been the practice on a regular or continuous basis but had depended on the circumstances surrounding the work performed by the contractor. He ultimately decided to settle the Hess and Lester grievances due to both the minimal payment that the Company would have to make and the potential benefit to labor/management relations at the mine. He did not intend, however, for the settlement to have any prospective effect and "specifically advised [Terry Puckett] that

the Company had no intention whatsoever of routinely equalizing time between union employees and contractors...." As for the language Hamilton used in entering the second step settlement of the Hess and Lester grievances, he states that he "merely intended to refer, generally, to the manner in which certain similar grievances had been handled in the past at the first step."

In light of these conflicting contentions of Puckett and Hamilton as to the terms of the subject settlement, the Company has made its motion for summary judgment, arguing that the substance and intended effect of the settlement must be determined by way of the dispute resolution mechanism that it and the Union agreed to utilize when becoming parties to the National Wage Agreement. Briefs have been submitted from both sides on this issue and the court is now prepared to rule on the Company's motion.

## II.

It is well established that a union and its members must exhaust their remedies as provided in their collective bargaining agreement with the employer before seeking judicial intervention. *National Post Office Mail Handlers Local No. 305 v. United States Postal Service*, 594 F.2d 988 (4th Cir.1979). When federal courts intervene, they often do so under the authority of Section 301 of the Labor Management Relations Act of 1947, which gives them the power to fashion a body of law to adjudicate suits for violations of contracts between an employer and a labor organization.[2] *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). And as the court explains in *United Mine Workers of America District No. 5 v. Consolidation Coal Co.*, 666 F.2d 806, 809 (3rd Cir.1981), a case the Company relies on heavily in its legal memorandum:

Although the majority of cases brought under Section 301 are actions to enforce

contractual promises to arbitrate or to enforce arbitration awards already rendered, it is indisputable at this point that any means chosen by the parties for settlement of their differences under a collective bargaining agreement can be judicially enforced in federal court as long as the settlement is final and binding under the contract. *Truck Drivers Union v. Riss & Co.*, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963).

*Id.* The Court goes on to point out, however, that in order to be judicially enforceable "a settlement agreement, like an arbitration award, must be sufficiently specific as to be capable of implementation." *Id.* at 809, 810 (citing *United Mine Workers v. Barnes & Tucker Co.*, 561 F.2d 1093 (3rd Cir.1977)).

■ *Consolidation Coal Co.* involved a dispute that arose over an alleged violation by the company of a provision of the National Bituminous Coal Wage Agreement relating to a prohibition against contracting out repair and maintenance work customarily performed by classified union employees. As in the present case, the company and union reached a settlement agreement at the second step of the Wage Agreement grievance procedure whereby the company agreed that "management will not violate Article IA, Sec. (a) and (g) of the contract." 666 F.2d at 808. Subsequent to the settlement, the company contracted out other work, which the union claimed should be performed by union employees. The union proceeded to bring a Section 301 action in federal district court seeking enforcement of the settlement agreement. At an evidentiary hearing, the court found, *inter alia*, that the subject work was work that customarily had been performed by union employees at the company, and ruled that such was in violation of the prior settlement. *Id.* On appeal, the Third Circuit reversed the district court upon finding

---

**2.** Section 301 of the LMRA states:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

that the dispute between the company and the union was arbitrable. *Id.* at 807. The court's analysis of the settlement at issue is as follows:

> [T]he settlement promises made by Consol were very general in their terms and offered no guidance to the district court in resolving questions of factual and credibility issues involved in this dispute over the [subject] work. The settlement agreement merely reiterates Consol's promise from the 1978 contract not to contract out repair and maintenance 'customarily performed by classified employees' as long as the necessary equipment is available and the employees have the skill to do the work. Neither the contract nor the settlement agreement defines these terms or outlines what work is, in fact, customarily performed by bargaining unit employees, and it is precisely the application of these terms which give rise to this dispute. Consol and the Union offered contradictory evidence as to whether [the subject] work was customarily done by bargaining unit employees, and the District Court resolved these factual issues in favor of the Union.

*Id.* at 810. The governing principles articulated by the court are that

> Federal courts are bound to exercise the utmost restraint to avoid intruding on the bargained-for method of dispute resolution and when enforcement of an arbitration award or settlement agreement is sought under Section 301, the court must be able to say 'with positive assurance' that the award or settlement was intended to cover the dispute. If the court has any doubt, the parties should be returned to their grievance procedure and arbitration, for it is an arbitrator, and not the court, who is to decide whether the same issue has already been resolved in an earlier proceeding.

*Id.* at 811 (footnote and citations omitted). In short, where the parties have agreed to utilize a grievance and arbitration procedure for the settlement of disputes "courts will not attempt to enforce a settlement that is too vague or ambiguous in its meaning or effect." *Id.* at 810.

■ Although the issue was not fully developed, the Fourth Circuit, in *National Post Office Mail Handlers Local No. 305 v. United States Postal Service,* 594 F.2d 988 (4th Cir.1979), expressly took into consideration the restrictions that govern the courts when called upon to enforce a settlement agreement reached through a contractual grievance process. There, in an action arising under a provision analogous to § 301 of the LMRA, the union was seeking to enforce numerous grievance settlements entered into by the union and the Postal Service. The district court had dismissed the action for failure, on the part of the union, to exhaust its contractual remedies. Considering the case under the strictures of Fed.R.Civ.Pro. 12(b)(6), the Fourth Circuit reversed the district court based on the fact that there did not appear from the record to be any question that the Postal Service had breached the grievance settlements at issue. *Id.* at 992. The court went on, however, to add the following caveat to its remand instructions:

> [I]f it should appear later in the proceedings after remand that there are factual disputes about whether any grievance settlements have been violated, it will be time enough then to invoke the exhaustion doctrine and remit the parties to their contractual remedies.

*Id.* Thus, even where the parties are not in dispute over the actual terms of a grievance settlement, but only over whether a breach of those terms has occurred as presented by the circumstances of a subsequent grievance, the courts must still defer to the parties' bargained-for method of dispute resolution. *See, e.g., Little Six Corp. v. United Mine Workers of America, Local Union No. 8332,* 537 F.Supp. 216 (W.D. Va.1982) (where this court held that it was for the arbitrator, and not the court, to decide whether the same issues in the subject grievance had been involved in a prior arbitration decision).

■ Based on this authority, the court is of the opinion that the case at bar is not a proper case in which to exercise jurisdiction

under § 301 of the LMRA. As in *Consolidation Coal Co.,* the written terms of the subject settlement are very general and offer little guidance for resolving factual and credibility issues involved in the dispute over the "equalization of time" for union employees of the Company. The Union argues that the Company indicated its intention to be bound by a time equalization policy by agreeing to abide by past first step settlements regarding this issue. The court, however, cannot interpret the language in the settlement agreement referring to past first step settlements without conducting a factual inquiry where such settlements were not the subject of written agreements; moreover, the parties have offered contradictory evidence as to the substance and intended effect of the settlement agreement. Consequently, the court cannot say "with positive assurance" that the terms of the settlement were intended to cover the disputed issues regarding the "equalization of time" in the grievances pending for arbitration at the time this suit was filed. Under these circumstances, the parties must be required to submit their dispute to arbitration, in accordance with their bargained-for dispute resolution procedure, at which the Union is, of course, free to argue that the settlement was so intended, and to marshall facts in support of that contention. To hold otherwise would be an intrusion by this court on the factfinding function that the parties have contractually assigned to that mechanism for resolving their disputes.

Therefore, the defendants' motion for summary judgment is hereby granted with costs taxed against the plaintiffs. The plaintiffs' complaint is accordingly dismissed and will be stricken from the court's docket.